Thank you for waiting. The next case on the argument calendar this morning is Benhabib v. Hughes Electronics Corporation. Good morning, Your Honors. I'm David Schaub of Schaub & Williams, appearing for the appellant Robert Benhabib. And my colleague is with me today, Steve Morgan. I thought maybe I would like to talk about, at least from my viewpoint, what seem to be a couple of main issues in both the contract case and also the wrongful termination case. And I'd like to get some water. Thank you. In the contract case, I think that one of the key issues in that case relates to the question of what was meant by the term change of control. And I wanted to point out, I have made a mistake in one of our briefs. I think it was the reply brief in which I indicated that the retirement plan that was subsequently amended by Hughes Network Systems had not been admitted in evidence, and actually, apparently it was. I looked through all the record, could not find that it had not been or had been. So I wanted to point out something that I didn't point out in my briefs, and that is the retirement plan, the Hughes Network non-bargaining retirement plan, that was relied upon in the trial court to indicate this is going to be the document. It's basically going to be adopted and amended, and it's going to define what change of control is. That is Exhibit 411 on the last page of Exhibit 411. It shows that I want to read along with you. Where do I find Exhibit 411? It's in the red set of excerpts, and it's tagged as number 23. So 411 is 23? Number 23. Before you refer to this, can you set the scene for me? Is this the written document that was entered into in connection with the sale that occurred one month after your client was terminated, or is this an earlier document? No, this is a later document. That's the main point I wanted to point out. Okay, so as you're talking about an implied contract, what relevance does a then unsigned written contract between two parties who entered into an agreement subsequent to your client's termination have to do with this case? It gives relevance to the testimony of Mr. Jackson. At the end of the trial, he was the last witness. He testified that Mr. Shaw, you're obviously a very capable lawyer, and one of the very first things that you studied in law school was the elements of a contract. Yes. Where were the elements of the contract, insofar as change of control, that were in existence and understood by both parties prior to the time of your client's termination? I think you find it in the testimony. The testimony of Mr. Beneby on one side, and the testimony of Mr. Jackson. Mr. Jackson didn't confirm on behalf of Hughes the same understanding that your client had? I think he did. Where did that show up? Well, in the reply brief. I think I cited it in our opening brief, but also in the reply brief. I have it right here inside. As a matter of fact, Mr. Jackson indicated that your client didn't receive documents defining change of control, because they didn't exist at the time of his employment. Does that correspond with the meaning of the minds on this important element of the contract? Right. And in the flyers that we have relied upon and that the court has seen, the exhibits 106, 107, I think 108, there is a reference to the fact that there was a close date. And in the testimony of Mr. Jackson, when I cross-examined him, he said, I asked him a question, what was the close date? And the answer, the close date would be the date in which the transaction that constituted the change in control closed or was completed, consummated. So that definition on his part coincides with our client's definition, that the transaction was a process that was taking place. Is it not? I'm sorry. That occurred at a later point, did it not? What occurred at a later point? Defining when the change of control occurred. But where is the testimony from Mr. Jackson that states that at the time your client was still employed by Hughes, that his understanding of change of control was the same understanding as Hughes, as it existed at that time? The question I posed to him was based upon the flyers that went out before my client was terminated. In that context, I asked him, what does it mean in this document that was given to employees at Hughes, including Mr. Benneby, the, quote, close date? Can you point me to the flyers? Where are they on the ERs? I've got them right here. We use the ERs as exhibit numbers, so I believe they're 107. Just point me to it because I want to read it. So where is it? Is this the document dated September 16, 2002? September 19, 2002? The document I'm looking at is September 16. You just tell me what it's supposed to be. There's an e-mail to Mr. Benneby that's dated September 19. Right, and then the underlying document is the sixth. Where in the document do you find the language that you want? The language I was talking to him. This was a special pension window flyer that went out because apparently people had questions about it. So where in that document is the language that you rely on? In that particular document it says, employees are understandably, in the second paragraph, anxious to know what their special pension window lump sum benefit would be if they are laid off due to a change in control and meet the eligibility requirements. In an earlier document, which is Exhibit 106, I referred to both of them in my questioning of Mr. Jackson. What was the document to which you now make reference? What transaction for the sale of Hughes Network was pending at that point? Is it the same one that ultimately closed the month after your client was terminated? I understand, based upon our brief and where we make reference that Mr. Cook testified, he participated in a committee that was talking to prospects, including News Corp, so that it was in progress starting in January. Our client was terminated February 20, I believe. Was that the one that ultimately closed? Yes. It was? With News Corp. All right. But wait a minute. Exhibit 106, they're talking about the Echostar merger agreement. Yes, I understand, because the documents at that time that were provided to employees provided this definition of the special pension window. With respect to Echostar? With respect to Echostar. With respect to Echostar, yes. That's not the company that ultimately purchased, right? No. So how can that represent a meeting of the minds for purposes of satisfying the elements of a contract prior to the time that your client was terminated? I don't say that Echostar does constitute part of the meeting of the minds. Well, then how does the implied contract exist? I indicated that Mr. Shaw, who was CEO of Hughes Electronics, at meetings after the Echostar deal failed because of the SEC disapproval of the transaction, assured those in attendance, including our client, that the company was still in the process of play and was talking to, he didn't say News Corp., but they were talking to someone about the proceeding and that the benefits remained the same. Okay, let me ask you this. Assuming for the moment that the document at Exhibit 106, which refers to Echostar, and the document at 107 that doesn't talk specifically, as far as I can tell. No, it has also Echostar. But assuming we're looking to both of those for the definition of change of control. No. We're not looking to them for definition of change of control? Because they make reference to, there's an oblique reference in, for example, 106. Yeah. In point three. Yeah, no, that's not very oblique at all. Well, if you look at point three to the end of the third line, you will say, laid off within two years after the closing, who qualify under the ETA special severance appendix. Right. And then if you look at Exhibit 30. Let's see. Let me find it. 3033, which is in the same excerpt of the volume at the beginning. And at the top of 33, it says, Hughes Employment Transition Assistance Plan. Yes. And that was restated as of January 20, 2003. Right. After the Echostar transaction was terminated. But what I'm trying to figure out is. And in that, it defines. Let me listen to you for just a second. Yes. What I'm after, I'm trying to figure out what language is in any of these documents gives me a sense as to what is meant by change of control. Are we talking about in the laid off during the process of change of control, or are we talking about laid off after change of control has been completed? And I'm trying to figure out what language we've got. And I'm asking you to point me to such language. Well, this document will lead you to it, but it doesn't give you that answer. So this document. But I would like to. I think you take a bigger picture here. Yes. Looking at your brief, you talk about laid off, quote, due to the merger. For the life of me, I can't figure out what factual scenario holds the termination here into what a change of control provision customarily does, which is that you're afraid that corporate management is going to change, so you look for another job, so the company gives you assurance. Nope. Anybody who's going to be laid off because of a change of control, we're going to take care of you. But the corporate management hadn't changed. Nothing had happened. The company was up for sale. Right. There hadn't been a change. The actual transaction took place after your client's termination. So how can the termination be linked to any due to change of control provision that the company had previously agreed to? The company didn't say, stay with the company. Anybody who stays with us now and doesn't leave until a couple years after the merger is protected. Everything I looked at, including what's cited in your brief, has some kind of causal link due to. And the change of control hadn't happened by the time your client had left. So how do you make that connection? Well, if you take a look at the testimony of Mr. Jackson, he indicated a change of control occurred in December 2003. And when had your client been laid off? And he was laid off in February 2003. So Mr. Jackson said, but what was the basis for his definition that there was a change of control that occurred in December 2003? Surely it couldn't be the written retirement plan because that didn't exist then. It couldn't have been. Change of control means somebody different's in charge. And your client's case says the same people who haven't liked me for a while finally got me. Well, if you... There's nobody different in control. I understand what you're saying. In my mind, if change in control is a process, then if you're in the middle of a change in control, because the parties are entering into an agreement, but then it has to be approved by the FCC because it had to be in the News Corp transaction as well, then it seems to me if you're laid off as a consequence of that change in control... The consequence. Then... If you had a buyer turning in a memo saying, we'll buy the company, but these people have to be gone, okay, you've got a causal link. But the factual scenario you've given us at least is laid out in your brief, and I didn't read the whole transcript of the trial, but the brief doesn't, to my eye, even try to make a causal connection. It tries to make a chronological connection that the company was in play and it happened during that time that the company was changing, but not because of a change in control, not because somebody new was coming in and now is the new management. How do we deal with the fact that the company made payments under the special pension window, even in December 2003, when under your viewpoint no change in control had happened? Company management was the same. News Corp bought a corporation called Hughes Electronics Corporation. They bought a controlling interest from General Motors Corporation. One of the subsidiaries of Hughes Electronics Corporation was Hughes Network Systems, which is the defendant in this case in the appellee. In December 2003, that transaction apparently closed. There was no change in control of Hughes Network Systems, but they issued... A different owner? No, same one, Hughes Electronics. Who was owned by? In turn, it was owned by News Corp. That's not a different entity? Not under the document that they put in the evidence, that the judge put in the evidence, rather, at the end of the trial. Well, under that theory, there never was a change of control then. Well, they treated it as a change of control. They followed the same procedure that we argued was the reality. There's two viewpoints here. Does the change in control have to be consummated in order to meet the... ...circumstances of the Exhibit 33, or does it have to be in process? Let's hear from the other side, and then we'll give you a chance to respond. You're somewhat over, but we'll make sure you get a chance to respond. Will I be able to respond on the termination? We'll see. Okay. Good morning, Your Honors. Lawrence Gartner for Defendant Use Network Systems. Could you please keep your voice up? I'm sorry. Lawrence Gartner for Defendant Use Network Systems. Let me just make a couple of very brief comments on the on the contract issue. And then turn to the alleged wrongful termination. I think one of the most important points on the contract issue is when the court below was hearing argument on the motion for judgment as a matter of law, it indicated that the definition of change in control was set forth in Exhibit 456 and asked Plaintiff's Counsel if that was the relevant definition. And Plaintiff's Counsel said yes. And under that definition, change of control is clearly defined as a material change in ownership of the company or a major business unit. That's interesting to me. So you're saying that unlike what my initial impression was that there's never a meeting of the minds about this implied contract, you're saying there was a meeting of the minds about change of control and it was set forth in 456, but according to the terms of 456, it didn't happen while the plaintiff's client was employed. Is that correct? I can't say there was a meeting of the minds, Your Honor, because plaintiff has testified that he had a different interpretation of that phrase. What I can say is if he were claiming a unilateral contract. Does Hughes agree that whatever it meant that there was an agreement between Mr. Benavieve and Hughes as to the meaning or as to the wording of change of control? No, we don't agree with that. You do not agree. Well, then I don't understand what you just said about 456. I'm just saying that in the court, at the end of the plaintiff's case, when the judge asked Mr. Schaub, is this the definition of change of control, Mr. Schaub said yes, or I believe so. But what was Hughes' position? Did Hughes say, yeah, we agree with that, or did it say, no, that was never agreed upon? No, Hughes does agree that that was the definition of change of control, the one set forth in Exhibit 456. Do you agree that there was an implied contract? No. What was missing in the contract other than the definition of change of control? Obviously, what was missing was Mr. Benavieve's agreement and understanding of that particular definition. Well, that doesn't make any sense. I mean, what you're saying is anybody can have a different perspective on the meaning of a contract. But this is stunning to me. I had no idea that Hughes was in effect conceding there was an implied contract and that the only issue was the meaning of change of control. No, Your Honor, we're not conceding there was an implied contract. We're conceding that there was a unilateral contract, like in many benefits issues. Well, a unilateral contract still has two parties that agree upon the terms of the contract. The only question, well, for your purposes, are you saying that Hughes unilaterally or on a bilateral basis agreed with Mr. Benavieve's outline except for the meaning of the term change of control? Well, Hughes agreed that Mr. Benavieve would have been entitled to enhanced pension benefits and enhanced transition or layoff benefits. Had he been laid off within, I believe, two years as a result of the change of control, which was the sale of his property. You do agree with that, and you do agree that 456 is the definition that was agreed upon. Yes, Your Honor. So then your only point is that didn't happen during his term, therefore he doesn't get anything. That's correct, Your Honor. I'm not sure I understand because I was at first disoriented a little bit too, but I think now I understand what you mean. Is it that, in fact, what the company said had meaning? Yes. And so you're not disavowing the existence of, on a different set of facts with a different claimant, the possibility of coming in and saying, look, you told me this was what was going to happen. I'd be protected. This did happen. I was terminated for that reason. So you're acknowledging that the company said something that potentially is legally actionable. Yes. But you're saying in this case, this plaintiff, based on this set of facts, doesn't come with what the company offered to its employees. Absolutely. And you're reinforced in that by the documents we were just looking at, including the relevant Echostar. Those are the same terms that were described in those Echostar documents. Pretty much, Your Honor. They did talk about after it closes, being laid off as a result of the closing. In two years. I mean, it's right there in that flyer. I don't want to call that a contract, but I'll certainly say that it's consistent with what you're arguing was the term with the contract. And the Echostar merger, there was an agreement. It did not close because the government would not approve the merger. And after that, there were negotiations and agreements signed with News Corp, which eventually received government approval and formally closed in December 22nd, 2003. Turning to Mr. Benhabib's wrongful termination claim. There are two arguments we made I'd like to address in the time I have available. The second argument, and that is lack of any kind of pretext. It's clear. The evidence was substantial and pretty much undisputed that H.N.S. in the 2001, 2002, 2003 time period was facing economic difficulties. They had a plan to cut expenses, as many companies had done in the past and are currently doing now. And that one of the components of that plan was to reduce labor costs by unfortunately laying people off. It's very much like the leading California Supreme Court decision. Let me ask you this and just short circuit this a little bit. Assume for the moment that Mr. Benhabib made his objections known to the statements made in that webcast and that his argument was, listen, you're basically telling lies about this company in order to increase the value. And let's assume that in response to his having made those comments, knowing that he made those comments, Mr. Cook fires him. Is that actionable? It is not actionable unless there is evidence of an improper motive. Well, he fires him because he made those comments. The comments call him out for lying in order to increase the value of the company. Is that actionable? Absolutely. That would be wrongful termination and violation of public law. So then that's what he's alleging. And the question is whether or not he's presented enough proof. Right. The issue is, did he present any significant evidence such that a jury could find his favor on that? You know, he's got a lot of circumstantial evidence. After he makes a fuss, he can't say that he himself told Cook. And he can't say that he knows that Fitzpatrick told Cook. But he can point to a lot of bad things that start happening after he makes a fuss. Why wasn't there enough then in the record from which a jury could plausibly conclude that there is a cause and effect relationship? For two reasons, John. First of all, clearly the evidence, regardless of what any claims he would have made, the evidence is that he was that there was an economic layoff. As to his selection for that layoff, the company presented during the trial the reasons why Mr. Badenby was selected. He was selected because 50 percent of his time, which he admitted, was spent on obtaining investors for a system for Latin America, which ultimately was abandoned. I understand all that. But what I'm after is, again, I'll do this a little bit in the abstract. We just know from all kinds of areas. I'll take a very old-fashioned labor case where some guy is a pretty bad employee. He comes up late all the time. He does all kinds of bad things. But he's kept on for years and years and years. Then he engages in some union organizing, and he's fired. And the lawyer says, well, we fired him because he's such a bad employee. And it's clear that he's a bad employee, but he's always been a bad employee. And the NLRB says, well, yeah, you had good reason to fire him, but it's pretty clear from the sequence of events that you fired him, not because of that, but because of his labor organizing. What I'm driving at is, it's possible that there were all kinds of reasons that were good reasons to fire him, including reduction in force, coming into trouble, they're giving his face away, the things he was working on, and so on. That doesn't necessarily mean that that's why they did it. Why wasn't it a jury question as to what their true reason was? Because, Your Honor, first of all, this is not an employee who was bad and kept on despite being bad. This is an employee who was a valued employee. There is no evidence whatsoever in the record, either before the analyst conference or after the analyst conference, of anyone making any negative comments about Mr. Benhabib. Well, no, that's not quite right. And he's a valued employee. He's apparently doing good work. He's getting good evaluations. And then, according to his evidence, he speaks up about what he says are the lies on the webcast, and all of a sudden his treatment changes radically. That's his evidence. The treatment, Your Honor, first of all, he talks about his performance evaluation, which he, in fact, admitted said he met his goals. So it was a satisfactory performance evaluation. He said, my travel was reduced. Well, of course his travel was reduced, Your Honor. Everyone's travel was being reduced. That was, in fact, one of the reasons or one of the reactions to the bad economic times. He says that Mr. Sharifi didn't like me. There's really no evidence of that. There's no comments by Mr. Sharifi. There's no documentation by Mr. Sharifi. I understand that Mr. Benhabib makes those claims, but there's nothing, there's no evidence to support that. Moreover, Mr. Sharifi, there's no evidence, knows anything about the complaint about security violations. He says some woman who's unidentified canceled a teleconference. We have no indication in the record what the teleconference was about, why it was canceled, was it ever rescheduled. I would submit to you, Your Honor, that there is nothing that has been presented to the trial, which, in fact, would have, as a logical basis, any kind of negative impact on Mr. Benhabib. What's the standard of review here? The court ruled as a matter of law that your client was entitled to judgment here. What are we to assume for purposes of evaluating whether the district court abuses discretion about how Mr. Benhabib's evidence should have been considered? Well, it's actually, I don't believe it's abuse of discretion.  Okay. In summary, judgment is a question of what's, you know. Is there enough legally significant evidence presented by Mr. Benhabib that a reasonable jury can come back and find in his favor? Okay, so that's the question that Judge Fletcher asked, is if you put all of that on the table, however weak it may be, if there's any basis on which a jury could find that the termination was pretextual, shouldn't he be entitled to go back and have a trial about this? No, not if, in fact, he presents, unless he presents substantial, meaningful, substantial evidence, which, one, would show that the reason for his termination was false, and, two, that an unlawful reason was there instead. His, I mean, the problem is, Your Honor, and that is there is nothing when you look at exactly the acts that he is claiming are pretextual, there's nothing that any logical jury could say was harmful to him or his career. I mean, he, and in fact, Your Honor, as we pointed out in our opposing brief, he made no comparison. He said, for example, one of his evidences of pretext is, I had less contact with Mr. Cook. But there's no evidence what contact he had with Mr. Cook before. There's no evidence of what contact he had with Mr. Cook afterwards. Mr. Cook obviously is in Maryland. He's in California. And he continues to send e-mails to Mr. Cook. He says, all of a sudden, I'm not getting the respondent to. No, I disagree, Your Honor. I don't think that's in the record. I think he said, and I think his testimony was, and I apologize if I'm incorrect, is, I did not have as much direct contact with Mr. Cook. Well, of course, Mr. Cook put another layer of management in between him and others, including Mr. Benavides, so he wouldn't have as much contact. But he doesn't say how that impacted him. He doesn't say how that was an adverse action. Not every action an employee disagrees with or is offended by is an adverse action such that a reasonable jury can come back and say, nope, the real reason was an unlawful motive. He wasn't demoted. We're not talking about what the real reason was for putting an additional layer of management in between the two of them. We're talking about what was the real reason for terminating him. Yes, Your Honor. Yeah, sure. And one, and I do think that it is, this is a recap of Goose versus Bechtel National, where the plaintiff claimed age discrimination, not termination and violation of public policy. And the California Supreme Court, in a very carefully crafted decision, said, and upheld summary judgment under the same, pretty much the same standard, said, given the overwhelming evidence of the economic need to lay off Mr. Goose, his claims of pretext, which were very similar, maybe even stronger than the ones made by Mr. Benhabib here, were not sufficient to create a tribal issue of fact. Thank you, Your Honor. Any further questions from the panel? Thank you. Mr. Schaum? Yes. Why don't we start out with two minutes on the clock, and we'll just kind of see. But if you could start out by addressing this question of termination and wrongful termination and pretext. Okay. I wonder if I might just read one piece with regard to the contract issue. Please go ahead. I don't mean to disrupt. The Hughes Electronics Corporation Incentive Plan, dated March 27, 2001, two years before the client terminated. This is the one that was admitted by the court at the end of the trial. If you do consider that, then in addition to the change in control definition that you find, if you take a look at page 435, and this is Excerpt 24 in the appellee's set of excerpts, it explains the effect of change in control. It says, acceleration of options and restricted stock units upon change in control event. Upon or as may be necessary to effectuate purposes of the acceleration immediately prior to the consummation of a change in control event, each option shall immediately vest, et cetera. It refers to consummation of a change in control event, which I submit is really more consistent with our argument that it is a process. But I don't want to – I just wanted to bring the site to your attention. With regard to – Could you just give us a quick summary of the evidence that you put forward that would give a reasonable jury ground to conclude that the animation, the reason for his firing, was his speaking up about what he says are the lies during the webcast? I'm sorry, I – Could you give us a quick summary of the evidence in your favor on the termination point? Yes. Okay. During the webcast, the client heard his comments made by those present, and after the webcast, he made his views known to not only Mr. Fitzpatrick, but also those subsequently – it indicates that in the brief – to Mr. Seraf, who was the vice president, and who reported directly to Mr. Sharifi, and also Mr. Fitzpatrick reported directly to Mr. Sharifi. In addition to that, the comments that preceded the webcast, those in particular that related to different slides that were shown in the webcast, were thoroughly discussed by Mr. Benebe with Mr. Cook. Even after – When? They were – he brought to Mr. Cook's attention the charts beginning in 2001, which there's one of those which is an exhibit of ours, and then he brought the charts to – Was that before or after the webcast? Before the webcast, he brought attention to another chart where it was ten times multiplexing before the webcast. After the webcast, he said, Mr. Cook – I mean, he was courteous about it, but he said, you know, before the webcast, I talked to you about this. We had the information. There was information available to show that it was ten times multicasting, and that we had at least a rationale for that, because he observed the webcast in which Mr. Cook said, I don't – I really don't know the answer to that. Later, Mr. Cook testified that the information concerning the amount of multiplying of the – that the ten times the multiplication was confidential, some kind of trade secret or something. Then the webcast itself, in the slides, there was no indication that there was an issue concerning the insurability of the satellites that were to be launched. Obviously, if you're launching satellites that are – have a cost of $1.5 billion, and if they fall out of the sky or they don't function in the sky because they're not competitive – I think I understand that part. What I'm after is what other evidence do we have that Mr. Cook might have been retaliating? Like, what adverse behavior did we have, changes in behavior, and so on? Okay. Well, the only time that I'm aware of that Mr. Benavide even saw Mr. Cook after the webcast was at a January conference in which all the employees were present. He sent out emails, and they were not responded to, as the court has indicated. He had communications one way with Mr. Sharifi, but he was rebuffed. Mr. Sharifi, who cut his travel expenses, Mr. Cook said, that was with my okay and approval. Mr. Sharifi, who canceled his meetings – He was the team leader for the North American plan to involve the use of the spot beams down in Mexico. When he canceled the meetings, Mr. Cook said, that was with my approval. Were other employees in the company likewise cut back on travel expenses? No evidence of that. There's no evidence of that. And in Exhibit 271 – You say that there's no evidence. I'm not sure it helps you. Well, yes, because other employees went on travel. One of the emails that sent evidence concerning that period that we described as evidence of retaliation, Mr. Sharifi decided to have other people go to Mexico instead of Mr. Benavide, and yet these people worked for him essentially because he was a team leader, but he was cut out on the trip and these other people were included. He wasn't even told why. Instead, he got a copy of the email advising him. So from what I can see in the record, he was not treated the same. Okay. Thank you very much. Thank both sides for your argument in this case, the case of Benavide v. Hughes Electronic Corporation and Hughes Network Systems, now submitted for decision. We've got one more case on the argument calendar this morning, and that's Montour v. Hartford.
judges: Fletcher W. , Fisher, Smith M.